WAYNE STENNETT, Administrator, Appellant, v. THE FIRST NATIONAL BANK OF RED OAK AND C. F. CLARKE. SAME, Appellant, v. RED OAK INVESTMENT COMPANY AND JOHN HAYES.

Contracts: ACCEPTANCE. J., in answer to defendants telegram, offered to take 75 cents on a dollar for certain securities, valued at $34,900; and defendant answered, asking if he would take $25,000 on ten days' option, to which J. replied that he would divide the difference. A telegram and a letter of defendant explaining that he had made a mistake in calculating the value of the securities, which were worth but $32,900, for which he would give $24,000, were never received during the lifetime of J. Held, that a contract for the purchase of the securities was never consummated, since defendant's alleged acceptance amounted to a new proposition, which never came to J.'s knowledge.

SAME: Ratification. The fact that an administrator, under the impression that defendant had a valid contract to purchase

securities which he held to secure a loan to deceased, accepted a cash balance and the canceled note of the deceased in settlement, was not sufficient evidence of a ratification of the contract to estop the administrator from insisting on defendant's accounting for the securities, where no valid contract had in fact been consummated.

ESTOPPEL TO DENY ACCEPTANCE. The fact that the conditional acceptance of a decedent's offer to sell certain securities held by defendant was received and acquiesced in by his widow and some of his heirs, who knew nothing of the original transactions between the contracting parties, was not sufficient to estop deceased's administrator from maintaining an action for an accounting.

SAME: *Laches.* Where the delay of an administrator in bringing an action for an accounting was occasioned by his misapprehension of the validity of a contract between the deceased and defendant, who had not altered his position on that account, it was not sufficient to estop plaintiff from maintaining the suit.

NECESSARY PARTIES. A bank and an investment company held securities as collateral for loans made to a deceased, which they held after his death under an alleged contract consummated by C., the cashier of the bank, and H., the general manager of the investment company. *Held*, that C. and H. were not necessary parties to an action by deceased's administrator for an accounting for such securities, since they acted for their principals. and were not personally liable.

*Appeal from Montgomery District Court.*—HON. N. W. MACY, Judge.

SATURDAY, OCTOBER 20, 1900.

THESE cases involve identical questions. They were tried together in the district court, and are submitted here on one record. The facts are in great part stipulated. So far as there is a controversy, the matters will be referred to as they arise in the course of the opinion. We give now a synopsis of the facts agreed upon:

The First National Bank is, as its name indicates, a banking corporation organized under the laws of the United

States, and doing business in Red Oak, Montgomery county, Iowa. Defendant Clarke is its cashier. The Red Oak Investment Company is also a corporation located at Red Oak, and its business is the making of loans, and buying and selling notes and mortgages. Defendant Hayes is the general manager. P. P. Johnson for many years lived in Montgomery county, where he had large property interests, and owed many debts. Among other of such debts, he owed large sums to the bank and the investment company above mentioned. Some years prior to the transaction here involved, Johnson moved to the state of Alabama, where he resided on a farm about 18 miles distant from the city of Montgomery, which was his postoffice, and to which place, by his arrangement, telegrams were sent, when speedy communication was desired with him, in care of W. B. Jones, a merchant of that city. In the month of August, 1893, Johnson's accounts with the two defendant corporations were as follows: He owed the bank, evidenced by note, the sum of $5,000, upon which interest in about the sum of $50 had accrued. For this the bank held as collateral security second mortgage notes of third persons to Johnson to the amount of $5,253, upon which there was accrued interest to the amount of $110.54. He owed the Investment Company on his three promissory notes, the sum of $18,000, upon which interest had accrued to the amount of more than $800. On September 1, 1893, this accrued interest was $890. To secure these notes, the Investment Company held second mortgage paper of third persons, pledged by Johnson, the principal of which was $25,791.19, and upon which there was accrued interest to the amount of $2,271.56. The Investment Company also held as collateral four other notes, amounting, with interest to $1,825.05. These four notes were afterwards turned over to the bank. The Investment Company further held as collateral certain notes secured by second mortgages on Ne-

braska real estate, and one unsecured note made by H. L. Johnson. The total amount of these last-mentioned notes, which, as will hereafter appear, were turned over to appellant, was $11,044.10. With affairs in this condition, on August 12, 1893, defendant Clarke, on behalf of the bank and the Investment Company, sent the following telegram to Johnson:

"Red Oak, Iowa, August 12, 1893. To P. P. Johnson, Care W. B. Jones, Montgomery, Ala.: What will you take for all collateral with Red Oak Investment Co., securing notes aggregating eighteen thousand dollars— money to be paid Hayes and First National Bank? Also, what will you take for Haddie's second mortgage. Telegraph answer. C. F. Clarke."

This was received by Johnson on the same day. On the seventeenth he responded by telegram as follows:

"Montgomery, Ala., 17th. C. F. Clarke: Seventy-five cents on the dollar for notes you describe. Here tomorrow. P. P. Johnson."

Clarke received this on the 17th, and the next day telegraphed Johnson:

"Red Oak, Iowa, Aug. 18, 1893. P. P. Johnson, Care W. B. Jones, Montgomery, Ala.: Will you take twenty-five thousand dollars for Iowa collateral with Hayes and with us, aggregating $34,900, face value, leaving out Nebraska, and give me ten days in which to endeavor to make a deal? C. F. Clarke."

Johnson received this on the 18th, and at once responded by telegraph:

"Montgomery, Ala., Aug. 18, 1893. C. F. Clarke: Will divide difference. Ten days' option amount stated. Will write. P. P. Johnson."

On the next day Johnson wrote as follows:

"August 19, 1893. C. F. Clarke—Dear Sir: Last telegram says:

$34,900.00 for ........................$25,000.00
Difference, $1,175.00; one-half, $587.50......    587.50
                                                 ——————
                                                 $25,587.50

"Interest to accrue after as soon as the deal is made,
———is the way it figures. Must be sorry times there.

                              "Yours truly, P. P. Johnson."

This letter was mailed at Montgomery on the twenty-
first day of July, and received by Clarke on the twenty-
third. The following telegram was sent by Clarke on Aug-
ust 31, 1893:

"Red Oak, Iowa, 31st. To P. P. Johnson. Care W.
B. Jones: Your proposition accepted. Will write you de-
tails. C. F. Clarke."

This message was delivered at the place of business of
Jones in Montgomery, but was never received by Johnson.
The reason for the failure to receive it will be stated here
after. Following this last message, and on the date given,
Hayes and Clarke wrote the two following letters to John-
son:

"Red Oak, Iowa, August 31st, 1893. P. P. Johnson,
Esq., Montgomery, Ala.—Dear Sir: The plan of Mr. C.
F. Clarke, by which we had hoped to receive the money on
your three notes, aggregating $18,000 and interest, did not
materialize. After it had failed, I submitted your offer
to Edward and Mr. Spalding, and am now advised that they
think best to close the deal. Accordingly the terms pro-
posed to Mr. Clarke are to be carried out. The money would
have pleased us better than the paper, even at the discount
you make; and, as it is, we will have to rustle with the pa-
per, and get the money out of it as fast as possible. In Mr.
Clarke's second telegram there was an error of $2,000.00
in his statement as to the amount of the Iowa collaterals.
He said $34,900.00, whereas the aggregate was approxi-
mately $32,900. Inasmuch as, in answering his first tele-
gram, you had said, 'Seventy-five cents on the dollar,' the

amount given in your letter needs correction. Figuring the matter close on the basis last proposed by you, the actual amount due you for the $32,941.00 of securities with us and at First National Bank is $24,123.42. Your three notes with us, including interest, are, to Sept. 1st, 1893, $18,-890.00. The whole amount of Iowa mortgages in our hands is $27,421.19, of which amount we should receive securities $25,794.07, and have retained $25,791.19, charging you balance, $2.88. We have transferred to C. F. Clarke, who very likely will finish his end of the deal, the rest of the mortgages, aggregating $1,630.00. The Iowa mortgages being disposed of there remain in our hands, subject to your order:

H. L. Johnson note........................$  924 10
Herman Wiedeman (mortgage and note) series of
    notes, aggregating ...................... 1,575 00
Frank Lambert (mortgage and notes) series of
    notes, aggregating ...................... 3,200 00
Jos. Parsell (mortgage and notes) series of notes
    aggregating ............... ............... 4,000.00
Howard Mather series of notes (no mortgage),
    aggregating .... ........................ 745 00
Jos. Parsell mortgage and note (one note)..... 600 00

    "The mortgages are assigned to us, assignment recorded, and will be reassigned to you, or to whom you may direct, when advised. Herewith find note No. 3,561, $5,-000.00, and No. 3,116, $6,500.00. The other note, No. 3,223, for $6,500.00, will be sent you soon as we can get it.
    "Yours truly,
                    "The Red Oak Investment Co.,
                            "By John Hayes."
    "Red Oak, Iowa, Sept. 5, 1893.  To P. P. Johnson, Esq., Montgomery, Ala.——Dear Sir:  At the time I wired you, asking you what you would take for the collateral in our hands, and the Red Oak Investment Co., I had a scheme to sell a good portion of it; but, owing to the con-

tinued stringency in the money market, I failed to make
sale.   John Hayes was fully informed as to what I was
trying to do, and the effort to sell was made to relieve him
in a measure.   After I failed to make the sale, he proposed
to surrender your notes and take his portion of the col-
lateral, as it made no difference to you who took the paper.
When we came to look the paper over, we found there was
$2,000 less than we thought there was when I wired you.
Mr. Hayes said he would send you a statement of the paper
which he took, and which I suppose he has done.   He
turned over to me $1,630.00 in paper, on the supposition
that I would take and complete the balance of my part of
the trade.   This leaves in my hands sixty-five hundred odd
dollars as collateral on what you are owing the bank.   Now,
I would prefer not to take the paper, but carry your note
and hold the paper as collateral for a while, at least.   John
Hayes still holds the Nebraska notes.   I presume you know
that Haddie has been and still is in pretty deep water.
His creditors urge payment, and I understand that Rosen-
baum Bros. have commenced suit against him.   If this is
so, I fear that a lot of other fellows will commence.   Yours
truly, C. F. Clarke."

Johnson was ill about this time.   On September 6th
the last telegram and these two letters were brought to his
house, and remained unopened until after his death, which
occurred at 2 o'clock A. M. of the seventh inst.   Plaintiff
is the ancillary administrator of Johnson's estate, appointed
in Montgomery county, in this state; and he brings this ac-
tion in equity to compel defendants to account for the value
of the collaterals held by them, respectively, over and above
the amount of Johnson's indebtedness to them.   Defend-
ants, in effect, claim that the correspondence set out amounts
to a purchase of said collaterals from Johnson.   It is also
claimed by the bank that under this purchase, after allow-
ing for the discount on the collaterals, there was due John-
son only the sum of $99.10, which was paid to plaintiff after

his appointment as administrator. Further, it is averred that the bank, after plaintiff's said appointment, delivered to him Johnson's note, which was accepted by him as paid, and that a full settlement of the whole matter was had with plaintiff. The Investment Company, while also claiming a purchase of the collaterals, avers that, in pursuance of the arrangement so made by correspondence, it sent Johnson, on August 31, 1893, two of his notes as paid—one for $5,-000, and the other for $6,500—and that Johnson received them before his death. The other note, representing the balance of the indebtedness to the company, was sent the principal administrator of Johnson's estate, in Alabama, and was by him received and retained. It is further said that a settlement in full was had with plaintiff, who received and accepted from the company the Nebraska collaterals. The trial court found: "There are no rights of creditors or minors involved, and the administrator and all the heirs of decedent, P. P. Johnson, by their acts and conduct are estopped from having an accounting herein; and plaintiff's petition herein should be dismissed at his costs." From this decree plaintiff appeals.—*Reversed.*

*C. E. & P. W. Richards* and *T. J. Hysham* for appellant.

*Smith McPherson* and *J. M. Junkin* for appellee.

WATERMAN, J.—While the answers set up a contract with P. P. Johnson for the purchase of the collaterals in question, no such claim is insisted upon by defendants in argument. We do not deem it necessary to say more than that the misunderstanding as to the amount of the securities would be sufficient to deprive the transaction of that element essential to all contracts—the meeting of the minds of the parties. The first telegram from Clarke asked for a price on all collaterals held by the bank and the Investment Company. This would include the Ne-

braska securities, which are not claimed to have been included in the bargain as finally made or sought to be made. Johnson's answer was that he would take 75 cents on the dollar. This offer was not accepted. Clarke's next communication was an inquiry by telegraph as to whether Johnson would take $25,000 for Iowa collaterals in the possession of the defendant corporations, aggregating $34,900. Johnson's response was by telegram and letter. He states that he will take for the $34,900 the sum of $25,587.50. The acceptance was by telegram and letter. It appears that the amount of collaterals was $32,941, and the amount due Johnson, as figured by defendant Clarke, was $24,123.42. Instead of an acceptance of Johnson's offer, this was in fact a new proposition by Clarke, which, as we have seen, never came to Johnson's knowledge, for he died before receiving it. Furthermore, if, for the purpose of argument, we consider Clarke's telegram and letter an acceptance of the offer made by Johnson, is was not within the time fixed therefor. To constitute a contract by acceptance of an offer, the terms of the offer must be strictly complied with. *Baxter v. Bishop,* 65 Iowa, 582; *Clay v. Ricketts,* 66 Iowa, 362, *Sawyer v. Brossart,* 67 Iowa, 678; *Gilbert v. Baxter,* 71 Iowa, 327; *Batie v. Allison,* 77 Iowa, 313.

II. There having, then, been no contract with Johnson for the purchase by the defendant corporations of these securities, is there anything in the conduct of the representatives of Johnson which precludes plaintiff from asserting a right to an accounting? First, the conduct of Johnson's heirs is relied upon as creating a bar to the relief sought. It is said that immediately after Johnson's death his widow and his heirs, who were all adults, had knowledge of the whole transaction, and acquiesced therein. If this were true, it might well be doubted whether it would affect the rights of the administrators. The heirs could have done nothing in the matter if they had desired to enforce any

claim on the part of the estate. *McLeary v. Doran,* 79 Iowa, 210.   But we are not forced to rest our conclusion upon this ground.   The undisputed facts are that only a part of the heirs had any knowledge of the contents of the letters and telegrams set out and the heirs who possessed such knowledge derived it from only a portion of the correspondence. They had the letters and telegrams from defendants, but none of those sent by Johnson. Knowing only one side of the matter, it seems farfetched to say that they will be held to have had notice or knowledge of the legal rights of the parties.   We come next to the conduct of the administrators; for, although the answer of the Investment Company sets up that two of Johnson's notes to it were canceled and sent to him before his death, and were accepted by him, the undisputed testimony shows that the notes were mailed at Red Oak on August 31st, and the letters reached Montgomery when Johnson was *in extremis,* and remained unopened until after his death, when they came into possession of the widow and a part of the heirs, who retained them. It is true that another note was canceled, and sent to and received by Seth Johnson, the principal administrator, at Montgomery, and that still another note, together with a small balance of cash, arrived at on settlement of the transaction set out in the correspondence of defendants, were delivered to plaintiff, and accepted by him. It also appears that plaintiff executed an assignment of one of the collateral mortgages to the bank. The claim is made that plaintiff, at the time he took this cash and note, had full knowledge of the rights of all parties. With relation to the conduct of Seth Johnson, we may say that he was one of the heirs, and had only such knowledge of the matters in dispute as did the others. What we have already said as to the heirs applies here.   As to plaintiff, it is asserted that after his appointment he went to defendant bank, and Clarke showed him all the

correspondence, save the last two letters set out, and that, with the knowledge thus conveyed , he ratified the contract with defendants, and accepted thereafter the cash balance and canceled note. In view of all the testimony, together with the pleadings herein, we are forced to the conclusion that the bank at this time was claiming to have a valid contract with Johnson. In the absence of the last two letters, the correspondence would tend to show this to be the fact. If plaintiff was led to believe that there was such a contract —and we think that he was induced to believe this—then his acts would not amount to a ratification. *Eggleston v. Mason,* 84 Iowa, 630; *Roberts v. Rumley,* 58 Iowa, 301. It is true, there is evidence going to show that, prior to this, one of the heirs told plaintiff of the facts within his knowledge, and expressed the belief that there was no contract; but the facts so told were such only as we have already seen were known to the heirs. Something is claimed on account of the alleged laches of plaintiff. No one has suffered by the delay in bringing suit, nor does it appear that defendants have altered their situation because thereof. So, also, if we accept the issue of estoppel as being presented by the pleadings, we cannot regard it as established; for plaintiff was manifestly misled by defendants into acting as he did. Through their representations he was led to think there was a binding contract with his intestate. Defendants therefore can claim nothing for the fact that he acted on this assumption. In our opinion, defendants should account for the amount received for the collaterals, with interest at 6 per cent. from the date of receipt, after deducting Johnson's indebtedness, with interest thereon up to date of payment, or to the time when funds sufficient were in hand to pay it. In making this computation, the Investment Company should be charged with the notes turned over to the bank, amounting to $1,825.05 at the time they were disposed of in this manner.

III.    Defendants Clarke and Hayes were acting for their respective principals in this matter, and such fact was known to all concerned.    There is no case against them personally, and the action should be dismissed so far as they are concerned.    The case is remanded for a decree in harmony with this opinion.—REVERSED.

DEEMER, J., taking no part.    GRANGER, C. J., not sitting.